**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

**CHARLES KELLAM, PHYLLIS**
**KELLAM,** and all other persons
and entities similarly situated,

        Plaintiffs,

    v.                                    **Civil Action No: 5:20-CV-85**
                                                Judge Bailey

**SWN PRODUCTION COMPANY, LLC**
and **EQUINOR USA ONSHORE**
**PROPERTIES INC.,**

        Defendants.

**ORDER OF CERTIFICATION TO**
**THE SUPREME COURT OF APPEALS OF WEST VIRGINIA**

      This Court respectfully requests that the Supreme Court of Appeals of West Virginia

exercise jurisdiction pursuant to W.Va. Code §§ 51-1A-1 to 51-1A-13, and answer the

questions of law set forth below.  The questions are critical to the disposition of the above-

captioned case pending in this Court, and it appears that the state of the law concerning

the issues presented is so uncertain that this Court cannot accurately and reliably predict

how these questions of law would be decided under West Virginia law.

**Procedural Background**

      The Kellams filed this purported class action on April 28, 2020.  SWN Production

Company, LLC ("SWN") and Equinor USA Onshore Properties, Inc. ("Equinor") were both

served on or about June 15, 2020.  On June 28, 2020, before SWN or Equinor's deadline

1

to answer or otherwise respond to the Complaint, then defendant Chesapeake Appalachia, LLC filed a voluntary petition for relief under Chapter 11 in the United States Bankruptcy Court for the Southern District of Texas.  Upon receiving the notice that Chesapeake had filed a bankruptcy petition, this Court entered an order staying this case on July 7, 2020. [Doc. 6].  On July 27, 2021, the plaintiffs dismissed Chesapeake from this case.  [Doc. 10]. The next day, the Court entered its Order Lifting Stay, and on August 3, 2021, the parties filed a stipulation agreeing that SWN and Equinor could answer or otherwise respond to the Complaint by August 10, 2021.  On August 10, the defendants filed a Motion for Judgment on the Pleadings.

### Relevant Facts

Based upon the facts alleged in the complaint, plaintiffs Charles and Phyllis Kellam entered into an oil and gas lease agreement with Great Lakes Energy Partners, LLC in August 2007.  Great Lakes assigned the lease to Chesapeake Appalachia, LLC.  Equinor acquired a portion of the working interest from Chesapeake's working interest in the Kellam Lease.  SWN also acquired working interests in the Kellam lease from Chesapeake.  SWN operates oil and gas wells and production units within which the lands leased by the Kellams have been included.

According to the Kellams, Chesapeake, SWN, and Kellam have all engaged in oil and gas production efforts under the authority of the Kellam lease "and each have deducted postproduction costs from royalty checks due and payable to Charles Kellam and Phyllis Kellam and other similarly situated persons and/or entities."

The Kellams allege that (1) their lease did not permit the deduction of post-production costs and (2) Chesapeake, Equinor, and SWN all improperly deducted

2

post-production costs when calculating royalties to be paid to the Kellams. All of their claims, whether characterized as breach of contract, breach of implied covenant, conversion, or misrepresentation are premised on the Kellams' assertion that it is improper for SWN and Equinor to deduct post-production costs. The Kellams also request a declaratory judgment that the defendants were not permitted to deduct post-production costs in the past and that they are not entitled to do so in the future.

The Kellam lease contains the following provisions:

4. In consideration of the premises the Lessee covenants and agrees:

(A)    To deliver to the credit of the Lessor in tanks or pipelines, as royalty, free of cost, one-eighth (1/8) of all oil produced and saved from the premises, or at Lessee's option to pay Lessor the market price for such one-eighth (1/8) royalty oil at the published rate for oil of like grade and gravity prevailing on the date such oil is sold into tanks or pipelines. Payment of royalty for oil marketed during any calendar month to be on or about the 60th day after receipt of such funds by the lessee.

(B)    To pay to the Lessor, as royalty for the oil, gas, and/or coalbed methane gas marketed and used off the premises and produced from each well drilled thereon, the sum of one-eighth (1/8) of the price paid to Lessee per thousand cubic feet of such oil, gas, and/or coalbed methane gas so marketed and used, measured in accordance with Boyle's Law for the measurement of gas at varying pressures, on the basis of 10

3

ounces above 14.73 pounds atmospheric pressure, at a standard base temperature of 60 degrees Fahrenheit and stipulated flowing temperature of 60 degrees Fahrenheit, without allowance for temperature and barometric variations less any charges for transportation, dehydration and compression paid by Lessee to deliver the oil, gas, and/or coalbed methane gas for sale.  Payment of royalty for oil, gas, and/or coalbed methane gas marketed during any calendar month to be on or about the 60th day after receipt of such funds by the Lessee.

(C)     Lessee to deduct from payments in (A) and (B) above from receipts of proceeds by Lessee, Lessor's prorata share of any tax imposed by any government body.

(D)     In the event Lessee does not sell the oil, gas, and/or coalbed methane gas to others, Lessor shall be paid on the basis of the lowest field market price paid by any public utility in the state at the well head for oil, gas, and/or coalbed methane gas of like kind and quality, and on the same basis that such utility would pay for such oil, gas, and/or coalbed methane gas, including any escalation in price that such utility would pay for such oil, gas, and/or coalbed methane gas as if a contract for the sale of same had been entered into at the time of initial production.

4

In addition, Paragraph 10 provides that if the leased premises are consolidated with other lands to form a development unit, "the Lessor agrees to accept, in lieu of the one-eighth (1/8) oil, gas, and/or coalbed methane gas royalty hereinbefore provided, that proportion of such one-eighth (1/8) royalty which the acreage consolidated bears to the total number of acres comprising said development unit." Paragraph 11 provides that "In case the Lessor owns a less interest in the above described premises than the entire and undivided fee simple therein, then the royalties and rentals herein provided for shall be paid to the Lessor only in the proportion which such interest bears to the whole and undivided fee."[1]

### Issues Certified

1.     Is *Estate of Tawney v. Columbia Natural Resources, L.L.C.*, 219 W.Va. 274, 633 S.E.2d 22 (2006) still good law in West Virginia?

2.     What is meant by the "method of calculating" the amount of post-production costs to be deducted?

3.     Is a simple listing of the types of costs which may be deducted sufficient to satisfy *Tawney*?

4.     If post-production costs are to be deducted, are they limited to direct costs or may indirect costs be deducted as well?

### Discussion

These issues must be viewed in conjunction with the law in this State concerning charges against royalties. Under West Virginia law, oil and gas lessees are prohibited from

---

[1] A copy of the lease is attached hereto.

deducting post-production expenses from royalties unless expressly provided for in the lease in terms that meet specific requirements. From the earliest West Virginia cases involving oil and gas royalties to the present, the West Virginia Supreme Court of Appeals has consistently adhered to the principle that landowners' royalties are to be paid on gross proceeds or gross market value free and clear of production, marketing and other costs. Two recent landmark decisions extend these basic principles and hold that post-production costs cannot be deducted from royalties, unless the relevant leases expressly provide otherwise.

In 1939, the West Virginia Supreme Court of Appeals addressed the question of whether an oil and gas lessee could allocate to the landowner a portion of the privilege tax due for entities engaged in the production of oil and gas and thereby reduce royalties. *Kanawha Valley Bank v. United Fuel Gas Co.*, 121 W.Va. 96, 1 S.E.2d 875 (1939). According to the Court, by this royalty clause, "the lessee bound itself to pay the lessor a full one-eighth of the market price of the gas at the well - not such price less one-eighth of the production tax." *Id*. To the extent the lessee made a deduction, the Court added: "The lessee's deduction would be a material, unilateral modification of the contract, a modification which courts cannot sanction." *Id*. The Court established clear precedent that royalties must be paid on the full value of the mineral extracted free of deductions.

Interestingly, within eleven days of the date of the *Kanawha Valley Bank* decision, the legislature amended the privilege tax statute in question, then W.Va. Code § 11-13-2, to provide that oil and gas producers shall pay the privilege tax based on the "entire production, with no deduction by reason of payments . . . to the owners of the royalty

interest . . . ." The amendment then provided: "[e]very person who is hereby required to pay said tax measured by the entire production of the property operated, is hereby authorized and empowered to deduct from any payment . . . to the owners of any royalty interest . . . that proportion of the tax paid which the said royalty . . . bears to the entire production." *See Cole v. Pond Fork Oil & Gas Co.*, 127 W.Va. 762, 767, 35 S.E.2d 25, 28 (1945). This amendment was declared unconstitutional in *Cole* on the basis that the statute violated the constitutional prohibition against impairing contracts. The premise for this conclusion was that the royalty clause in the contract, the oil and gas lease, required that the lessee pay the lessor "one-eighth part of the proceeds from the marketing or sale of natural gas." *Cole*, 127 W.Va. at 764, 35 S.E.2d at 26. As in *Kanawha Valley Bank*, the Court found that this clause required payment on the gross proceeds with no deduction for a tax. Accordingly, to the extent the legislature was attempting to authorize a deduction not permitted by the contract, the Court held that the legislation abrogated the contract and was a "plain violation" of the Constitution. *Cole*, 127 W.Va. at 772, 35 S.E.2d at 30.

In *Kohlsaat v. Main Island Creek Coal Co.*, 90 W.Va. 656, 112 S.E. 213 (1922), the Court was presented similar issues under a 1913 coal lease requiring the lessee to pay as royalty "ten (10) per cent. of the selling price of said coal above ninety (90) cents per ton." *Kohlsaat*, 112 S.E. at 214. During World War I, the President of the United States issued an executive order permitting an increase of 45 cents in the price of coal per ton, provided there was a corresponding increase in the wages of miners. The coal company availed itself of the opportunity and increased its sale price by 45 cents, and in addition, employed a sales agent to assist with sales. *Id*. In calculating royalty, the coal company

7

deducted from the sale price before calculating royalty the 45 cent increase on the grounds

that it received no benefit of the increased price, along with the commissions paid the sales

agent. *Id*. at 216. Upon challenge by the lessor, the Court ruled that the lease, in requiring

royalty of 10% of the sale price, was clear and unambiguous and required that the

calculation be made on the gross sale price, including the 45 cent increase, with no

deductions. *Id*. at 217. The Court reasoned that the relative profit or loss of the lessor and

the business risks faced were matters over which the lessor had "no voice or control" and

were of "no moment to them, except the laudable concern of a landlord for the success of

the tenant." *Id*. at 216. With respect to commissions, which were deducted as

post-production costs, the Court held they were "a necessary part of its business . . . so far

as the contract for the payment of royalties is concerned" and were not deductible from

royalty. *Id*. at 217.

In two more recent cases, the obligations of a lessee to pay royalties as required by

the terms of leases were addressed, and the backdrop in each case was the

post-production cost of transporting gas to the sales point. The first case, ***Cotiga Dev. Co.***

***v. United Fuel Gas Co.***, 147 W.Va. 484, 128 S.E.2d 626 (1963), involved a 1929 lease

covering 34,519 acres entered between Cotiga and Woods Oil and Gas Company. The

day after the lease was executed, Woods Oil and Gas assigned the lease to United Fuel.

United Fuel ultimately drilled 16 wells and a sublessee drilled an additional 8 wells. The

gas royalty clause in the lease required payment of 1/8th "of the gas produced . . . at the

rate received by Lessee for such gas." ***Cotiga***, 147 W.Va. at 489, 128 S.E.2d at 630.

Instead, United Fuel calculated royalty on the basis of the "wellhead or field price." A key

8

issue on appeal was whether United Fuel was required to adhere to the literal terms of the lease and pay royalty on the price received, wherever the gas was sold, regardless of the fact that it was a public utility at the time, with the large overhead expense of delivering gas to utility customers after extensive transportation and handling. *Id*. The Court rejected United Fuel's contention that royalty should be paid on the field price, as if a company such as the original lessee had developed the property, and held that the terms of the lease were clear and unambiguous and required that royalty be paid on the gross proceeds received by United Fuel whenever and wherever the gas was sold. *Id*. 147 W.Va. at 492– 93. While not directly addressing the issue of post-production costs, the heart of this case and the over-arching issue was the fact that the sale price or "rate received" by United Fuel was significantly higher at the sale end than in the field, and this difference was ultimately attributable to transportation, commingling and handling, yet United Fuel was denied consideration of these cost factors.

In a similar vein, the Fourth Circuit in ***Imperial Colliery Co. v. OXY USA Inc.***, 912 F.2d 696 (4th Cir. 1990), considered the lessee's obligations under a 1944 lease requiring that the 1/8th royalty be based on "the current wholesale market value at the well." *Id*. at 699. In that case, OXY had thirteen wells in production on the property and all gas was committed to a long term sales contract entered in 1948, under which OXY transported the gas through a 12-mile pipeline, compressed the gas at a compressor facility and metered it before moving it into the transmission line of the buyer. *Id*. The underlying record in that case established that the sale price under the contract was 32.74 cents per thousand cubic feet ("mcf"), that OXY deducted over 20 cents per mcf for transportation, compression and

handling and paid royalty on a net sale price of 12 cents.  The record further established that the market values of gas rose from 50 cents per million British Thermal Units ("mmbtu") in 1975 so that average market values over the relevant period were $3.50 per mmbtu.  The dramatic difference between the sale price, netted to 12 cents, and market value led the lessor to institute suit for the underpayment of royalty, asserting that the lessor was entitled to be paid in accordance with the literal language in the lease. Specifically, the plaintiff asserted that royalty be based on market value as opposed to the sale price.  So calculated, the 1/8th royalty on $3.50 gas was 44 cents, and this was more than the sale price of 32.74 cents, and far more than the net price of 12 cents.   The over-arching issue in *Imperial Colliery* was the fact that production expenses exceeded income for many years and the overall operations were conducted with significant losses. Nevertheless, both the District Court and the Fourth Circuit held that the lessor was entitled to the full value of 1/8th of the market value of its gas, and no consideration was given to the cost of transportation, compression and handling.

In *Cotiga*, the Court recognized that the decision had a harsh result, and certainly the same could be said for *Imperial Colliery*.  Both decisions, however, were based on the same simple proposition that oil and gas leases providing for 1/8th of either the proceeds received or the market value of gas are clear and unambiguous contract terms, they must be given effect and they require that royalty be based on the gross price or value.  While neither case directly addressed post-production costs, these costs were a major underlying factor in both cases, and neither court considered adjustment for them.

10

To the extent post-production costs were background issues in *Cotiga* and *Imperial Colliery*, they came to the forefront in the two recent royalty cases in West Virginia: *Wellman v. Energy Res., Inc.*, 210 W.Va. 200, 557 S.E.2d 254 (2001), and *Estate of Tawney v. Columbia Nat. Res.*, 219 W.Va. 274, 633 S.E.2d 22 (2006). In these cases, the West Virginia Supreme Court of Appeals adhered to the prohibition against deducting post-production costs from royalty, and further, greatly restricted any exceptions to this rule, first, to leases which not only express an intent to allocate post-production costs, but meet three expressed conditions, and, second, to cases meeting three additional factual predicates.

*Wellman* involved an oil and gas lease with a "proceeds" type royalty clause requiring that the lessee pay 1/8th of "the proceeds from the sale of gas . . . at the mouth of the well." 210 W.Va. at 204, 557 S.E.2d at 258. The lessee in that case sold the gas for $2.22, deducted post-production costs to arrive at a net sale price of $.87 and then paid royalty on the net of $.87. *Id*. The ability to deduct such costs was squarely presented. In considering this issue, the Court looked first to *Davis v. Hardman*, 148 W.Va. 82, 133 S.E.2d 77 (1963), and Donley, the Law of Coal, Oil and Gas in West Virginia and Virginia (1951), for the general proposition that royalties are "not chargeable with any of the costs of discovery and production." *Wellman*, 210 W.Va. at 210, 557 S.E.2d at 264. (It also could have looked to *Kanawha Valley Bank*, *Cole* and *Kohlsaat*.). The Court recognized that, despite this generally recognized concept, some producers charged lessors with a pro rata share of certain expenses recognized as "post-production" expenses and that a split among the states has developed on the ability to deduct these costs. *Id*. In siding with the

11

states that have held that post-production costs are not deductible from royalty, the Court found that the rationale for the result rests upon the implied covenant to market which "embraces the responsibility to get the oil or gas in a marketable condition and actually transport it to the market." *Id*. Recognizing that "West Virginia holds that a lessee impliedly covenants that he will market oil or gas produced," the Court concluded that a lessee must "bear the cost of complying with his covenants under the lease."  Upon this reasoning, the Court concluded:

> If an oil and gas lease provides for a royalty based on proceeds received by the lessee, unless the lease provides otherwise, the lessee must bear all costs incurred in exploring for, producing, marketing, and transporting the product to the point of sale.

Syl. Pt. 4, *Wellman*.

This straightforward Syllabus Point establishes a clear and controlling general principle for oil and gas royalties that post-production costs cannot be deducted.  In so holding, however, the Court recognized that parties by a contract which "provides otherwise" may agree that a lessor shall bear some of the costs, and in such a case, the Court further held by syllabus point:

> If an oil and gas lease provides that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, the lessee shall be entitled to credit for those costs to the extent that they were actually incurred and they were reasonable.  Before being entitled to such credit, however, the lessee must prove, by evidence of the type normally developed

12

in legal proceedings requiring an accounting, that he, the lessee, actually incurred such costs, and that they were reasonable.

Syl. Pt. 5, *Wellman*.

The Court then determined that Energy Resources failed to introduce any evidence that the post-productions costs "were actually incurred or that they were reasonable." 210 W.Va. at 211, 557 S.E.2d at 265.  For failure to meet this condition, the Court held that costs were not deductible and that royalty must be paid on the gross sale price. *Id.*

Thus, *Wellman* establishes the general rule in West Virginia that post-production costs may not be deducted from royalty unless a lease affirmatively "provides otherwise" that they can.  In those cases where the lease "provides otherwise" costs may be deducted only if:  (i) they are actually incurred, (ii) they are reasonable, and (iii) they can be proven in an accounting.

In *Tawney*, *supra*, the Court not only affirmed the general principle that post-production costs may not be deducted from royalty, but provided clear guidance on the requirements to "provide otherwise" that costs may be deducted.  *Tawney* was a class action involving approximately 8,000 plaintiffs with 2,258 leases of varying forms and types, including both "proceeds" and "market value" clauses.   At least 1,382 of the leases at issue in *Tawney* had language indicating that the royalty payment is to be calculated "at the well" and "at the wellhead," language similar to the lease in *Wellman*, but also included leases which more clearly suggested that deductions might be taken with provisions such as: "net of all costs beyond the wellhead," or "less all taxes, assessments, and adjustments." 219 W.Va. at 269, 633 S.E.2d at 25.  The lessee in *Tawney* asserted that

13

the above provisions permitted the lessee to deduct post-production expenses from the lessors' royalties.  The Court rejected these arguments and held that the language in question was ambiguous and therefore ineffective to permit the lessee to deduct post-production expenses from the lessors' royalties.  The holding of the Court is stated in Syllabus Point 11, as follows:

> Language in an oil and gas lease that provides that the lessor's 1/8 royalty is to be calculated "at the well," "at the wellhead," or similar language, or that the royalty is "an amount equal to 1/8 of the price, net all costs beyond the wellhead," or "less all taxes, assessments, and adjustments" is ambiguous and, accordingly, is not effective to permit the lessee to deduct from the lessor's 1/8 royalty any portion of the costs incurred between the wellhead and the point of sale.

Syl. Pt. 11, *Tawney*.

The Court then considered the requirements for "providing otherwise" that costs can be deducted.  The holding of the Court on this issue is found in Syllabus Point 10 of *Tawney* which states:

> **Language in an oil and gas lease that is intended to allocate between the lessor and lessee the costs of marketing the product and transporting it to the point of sale must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and the point of sale, identify with particularity the specific deductions the lessee intends to take from the lessor's royalty (usually 1/8), and**

14

**indicate the method of calculating the amount to be deducted from the royalty for such post-production costs.**

Syl. Pt. 10, *Tawney* (emphasis added).

The above conditions pre-suppose the *Wellman* requirements that post-production costs be "actually incurred", "reasonable" and that they can be proven in an accounting. Indeed, these requirements were stated to be "presumed" in the certified question answered by the *Tawney* Court. *Tawney*, 219 W.Va. at 269, 633 S.E.2d at 25. When the *Tawney* and *Wellman* requirements are combined, six conditions must be met before a lessee may deduct post-production costs from royalties. These are:

1. The lease must expressly provide that the lessor shall bear some part of the costs incurred between the wellhead and point of sale;

2. The lease must identify with particularity the specific deductions that the lessee may take;

3. The lease must expressly provide for a method of calculating the amount to be deducted from royalty for post-production costs;

4. The costs, which have been identified with particularity, must be actually incurred;

5. The amount of the costs must be reasonable; and

6. The lessee must prove all costs as it would in an action for an accounting.

If all six elements are not established, the lessee is not permitted to deduct post-production expenses. *See also W.W. McDonald Land Co. v. EQT Prod. Co.*, 983 F.Supp.2d 790,

15

797–799 (S.D. W.Va. 2013) (surveying relevant West Virginia gas law to the present). Accordingly, in light of the restrictions set forth in *Wellman* and *Tawney*, and the need to carefully scrutinize calculation of post-production activities, whether it be alter-ego self-dealing, or a "sweetheart" deal with an affiliate, if a lease provides for post-production deductions, actual and reasonable costs must mean the actual and direct costs incurred rather than the costs charged by a company.

Subsequent to the West Virginia Supreme Court's decisions in *Wellman* and *Tawney*, Judge Joseph Goodwin had the occasion to apply their holdings in a case involving many, if not all, of the same defendants as in this case. In *W.W. McDonald Land Co. v. EQT Production Co.*, 983 F.Supp.2d 790 (S.D. W.Va. 2013) *opinion clarified* (Jan. 21, 2014), Judge Goodwin noted that:

both *Tawney* and *Wellman* are premised on the implied duty to market gas produced:

The rationale for holding that a lessee may not charge a lessor for "post-production" expenses appears to be most often predicated on the idea that the lessee not only has a right under an oil and gas lease to produce oil or gas, but he also has a duty, either express, or under an implied covenant, to *market* the oil or gas produced. The rationale proceeds to hold the duty to *market* embraces the responsibility to get the oil or gas *in marketable condition* and *actually transport it to market.*

*Tawney*, 633 S.E.2d at 27 (emphasis added) (quoting *Wellman*, 557 S.E.2d at 264). The court in *Wellman* explained that West Virginia law "holds that a lessee impliedly covenants that he will market oil or gas produced." 557 S.E.2d at 265. The court continued that "historically the lessee has had to bear the cost of complying with his covenants under the lease. It, therefore, reasonably should follow that the lessee should bear the costs associated with marketing products produced under a lease." *Id*. The court explained in both *Tawney* and *Wellman* that its decisions were predicated on the "duty, either express, or under an implied covenant, to market the oil or gas produced." *Tawney*, 633 S.E.2d at 27 (quoting *Wellman*, 557 S.E.2d at 264). *Tawney* and *Wellman* both cite Professor Robert T. Donley's seminal treatise, which also discusses an implied duty to market gas produced:

> From the very beginning of the oil and gas industry it has been the practice to compensate the landowner by selling the oil and by running it to a common carrier and paying to him one-eighth of the sale price received. This practice has, in recent years, been extended to situations where gas is found. . . .   In the absence of an express covenant *to market* either oil or gas, the court implies one in order to effectuate the basic purpose of the lease . . . .

Robert T. Donley, *Law of Coal, Oil and Gas in West Virginia and Virginia* § 104 (1951) (emphasis added).

17

By basing the *Wellman* and *Tawney* decisions on the implied covenant to market, the Supreme Court of Appeals indicated that it was adopting a version of the "marketable product" rule. *See* 3 Eugene Kuntz, Law of Oil and Gas § 40.5 (Lexis 2013) (The *Wellman* decision "rel[ied] on the implied covenant to market [and] adopted a marketable product rule. . . ."); Owen L. Anderson, *Rogers*, *Wellman*, and *the New Implied Marketplace Covenant*, 2003-1 Rocky Mtn. Min. L. Inst. 13A (2003) ("*Wellman* take[s] the view that royalty is owed on the value added by transportation incurred to move gas to a first market unless the lease expressly provides otherwise."); *cf. Appalachian Land Co. v. EQT Prod. Co.*, 2012 WL 523749 (E.D. Ky. Feb. 16, 2012) (deciding whether Kentucky follows the marketable product rule or the "at-the-well" rule, and citing *Tawney* to show that West Virginia does not follow the "at-the-well" rule). Under the marketable product rule, lessees impliedly covenant to bear the costs of getting gas into marketable condition and transporting it to market. *See* 5 Howard R. Williams and Charles J. Meyers, *Oil and Gas Law* § 853, p. 396.3 (2012) ("[T]he implied covenant to market as a prudent operator includes an implied duty to prepare the natural gas for a market and even to transport the gas to a commercial market."); Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations Be Determined Intrinsically, Theoretically, or Realistically?* (Part 2), 37 Nat. Resources J. 611, 634 (1997) (implying that the marketable product rule requires lessees to bring

gas to marketable condition and marketable location).  Other cases applying versions of the marketable product rule hold the same. *See, e.g.,* ***Rogers v. Westerman Farm Co.****,* 29 P.3d 887, 906 (Colo. 2001) ("Absent express lease provisions addressing allocation of costs, the lessee's duty to market requires that the lessee bear the expenses incurred in obtaining a marketable product.  Thus, the expense of getting the product to a marketable condition and location are borne by the lessee."); ***TXO Prod. Corp. v. State ex rel. Comm'rs of Land Office****,* 903 P.2d 259, 262–63 (Okla. 1994) (holding that post-production costs of compression, dehydration, and gathering were not deductible from royalties because these costs were necessary to deliver the gas into a pipeline).

983 F.Supp.2d 790, 800–02.

After careful consideration of West Virginia law, Judge Goodwin held:

1.     That "[t]he defendants cannot calculate royalties based on a sale between subsidiaries at the wellhead when the defendants later sell the gas in an open market at a higher price.  Otherwise, gas producers could always reduce royalties by spinning off portions of their business and making nominal sales at the wellhead.  I predict with confidence that, if confronted with this issue, the Supreme Court of Appeals would hold the same. *See* ***Howell v. Texaco, Inc.,*** 112 P.3d 1154 (Okla. 2004) ("an intra-company contract is not an arm's length transaction, [and] it is not a legal basis on which [a producer] can calculate royalty payments"); ***Beer v. XTO Energy,***

*Inc.,* 2010 WL 476715 (W.D. Okla. Feb. 5, 2010) (gas sale at wellhead between two controlled, affiliated companies not appropriate for royalty calculation)"; and

2.      "Absent lease language to the contrary, *Tawney* requires lessees to pay royalties free of these costs.  The defendants cannot avoid *Tawney* by simply reorganizing their businesses and making intra-company wellhead sales.  Accordingly, I **FIND** that *Tawney's* specificity requirements apply to royalty payments made under the defendants' work-back method after 2005."

*W.W. McDonald Land Co.*, 983 F.Supp.2d at 804 (S.D. W.Va. 2013).

Finally, on May 26, 2017, the West Virginia Supreme Court issued its opinion upon rehearing in *Leggett v. EQT Production Co.*, 239 W.Va. 264, 800 S.E.2d 850 (2017).  In *Leggett*, the Court held that under flat rate leases which are "converted" under W.Va. Code § 22-6-8, post-production expenses may be deducted from royalties.  Syllabus Point 8 of *Leggett* states that "[r]oyalty payments pursuant to an oil or gas lease governed by West Virginia Code § 22-6-8(e) (1994) may be subject to pro-rata deduction or allocation of all reasonable post-production expenses actually incurred by the lessee.  Therefore, an oil or gas lessee may utilize the 'net-back' or 'work-back' method to calculate royalties' owed to a lessor pursuant to a lease governed by West Virginia Code § 22-6-8(e).  The reasonableness of the post-production expenses is a question for the fact-finder."

In *Leggett*, the Court noted that the "*Wellman* and *Tawney* Courts' refusal to align with other states which have more fully developed this rule has, according to these

20

commentators, created 'chaos' and 'foster[s] the belief—perhaps the reality—that the [marketable product] doctrine lacks any cornerstone principles[.]'" 239 W. Va. 264, 277, 800 S.E.2d 850, 863 (2017).

Beyond its conclusion that *Tawney* and *Wellman* were not relevant to its examination of W.Va. Code § 22-6-8 in conjunction with canons of statutory interpretation, as opposed to rules of contractual construction, any criticism of *Tawney* and *Wellman* contained within *Leggett* is mere dicta and does not alter the current controlling nature of those precedents.

In *W.W. McDonald Land Co.*, the District Court reasoned that "'[r]easonableness' is a common legal standard that has been used by courts for more than a century" and is commonly understood to mean "fair; just; ordinary or usual; not immoderate or excessive; not capricious or arbitrary." *Id.* at 808, 810. While "reasonableness" may be a common legal standard, the *Tawney* Court did not hold that to allow a lessee to deduct post-production costs from the lessor's royalty, the lease must generically recite a common legal standard; rather, it held that the lease must "indicate the **method of calculating** the amount to be deducted[.]" *See* Syl. Pt. 10, *Tawney*, 633 S.E.2d 22 (emphasis added). Plainly, "reasonableness" is not a method of calculation. Indeed, the word "method" means "a procedure or process for attaining an object: such as . . . a way, technique, or process of or for doing something." The word "calculate" means "to determine by mathematical processes."[2] Thus, a "method of calculation" is a procedure, technique, or process for mathematically determining something.

_____

[2] See https://www.merriam-webster.com/dictionary/calculate.

The word "reasonable" is merely an adjective, not a mathematical formula or process.  The same goes for the terms "actual" and "incurred," as neither of these terms indicate any particular mathematical process.

Most importantly, the words "reasonable," "actual," and "incurred" give prospective lessors no information as to how deductions will be calculated.  Stating in a lease that deductions will be "reasonable" does not describe any particular mathematical process nor objective limitation.  Instead, it forces prospective lessors to rely on the lessee's conclusory representation that the calculation will be "reasonable" without giving the prospective lessor an opportunity to evaluate for himself or herself whether the lessee's methods are "reasonable."  As the District Court in *W.W. McDonald Land Co.* acknowledged, the word "reasonable" is "[is a] relative term [] with no fixed or rigid meaning." *Id*. at 808.  As such, it tells prospective lessors utterly nothing about the specific method of calculation that will be used to determine the amount deducted from their royalty.   The fact that "reasonableness" is a legal standard for courts to use when ultimately ruling on whether a lessee's deductions were permissible under the law does not mean that mere use of the word "reasonable" gives lay persons a sufficient indication of "the method of calculating the amount to be deducted from the royalty," as required by *Tawney*, at the outset of the lease.  Similarly, stating in a lease that the lessee will deduct "actual" post-production costs or "incurred" post-production costs tells prospective lessors utterly nothing about the method of calculation used to derive those "actual" and/or "incurred" post-production costs.

In other words, if the *Tawney* Court intended the third prong of Syllabus Point 10 to require only that the lessee affirmatively state in the lease that its deductions will be

22

"reasonable," "actual," and/or "incurred," then the Court would have said that instead of saying that the lease must "indicate the method of calculating the amount to be deducted." However, as previously discussed, the *Tawney* Court was concerned with making sure that lease language intended to permit deductions for post-production costs clearly states the method of calculating those deductions so that lessors are informed as exactly how their royalties are to be calculated.   *See* 633 S.E.2d at 28, 29–30, 219 W.Va. at 273. Accordingly, the *Tawney* Court held in plain terms that lease language intended to allocate a portion of the post-productions costs to the lessor(s) must "indicate the method of calculating the amount to be deducted from the royalty for such post-production costs." *Id.* at 30, 274 (emphasis added).   Thus, the *W.W. McDonald Land Co.* construction of *Tawney* to require only the use of the word "reasonable" is inconsistent not only with the plain language of Syllabus Point 10 of *Tawney*, but also with the *Tawney* Court's intent. A holding that the mere use of the words "actual" and/or "incurred" satisfies *Tawney's* method of calculation requirement would likewise be inconsistent with both the plain language and intent of *Tawney*.

There would be no reason for the Court to specifically include the third prong (that is, that the lease set forth the method of calculating the amount to be deducted) in addition to the other two prongs if it could be satisfied by simply stating that the costs to be deducted will be "reasonable," "actual," and/or "incurred." Mere use of the words "reasonable," "actual," and/or "incurred" in a lease to describe the costs to be deducted from the prospective lessor's royalty does not give the prospective lessor any useful information beyond that required by the first two prongs of the *Tawney* standard.   It is

23

highly unlikely that when the West Virginia Supreme Court of Appeals drafted the third prong of Syllabus Point 10 of *Tawney*, the Court's goal was to ensure only that lessees make the gratuitous, unspecific, and ultimately useless assertion in their leases that the costs they deduct will be "reasonable," "actual," and/or "incurred." This generic, conclusory assertion essentially states that the lessee will not charge the lessor for unreasonable post-production costs that the lessee made up out of thin air and did not actually incur – something that the lessee was already prohibited from doing by law.

Indeed, at the time *Tawney* was decided, the Court had already held five years earlier in *Wellman* that, where a lease contains language sufficient to allow a lessee to charge a portion of its post-production costs to the lessor, the lessee still could only deduct costs that were 'actually incurred' and 'reasonable,' and that lessees must prove that such costs were "actually incurred" and "reasonable." Syl. Pt. 5, *Wellman*, *supra*. Accordingly, the Court's holding in *Tawney* that lease language intended to permit deduction of post-production costs must "indicate the method of calculating the amount to be deducted" would be redundant if it only required a bald assertion that the costs deducted will be "reasonable," "actual," and/or "incurred." What would the *Tawney* Court accomplish by requiring lessees to state in conclusory fashion that the costs they deduct will be "reasonable," "actual," and/or "incurred," as was already required under *Wellman*? This does not give prospective lessors any information about the lessee's "method of calculating the amount to be deducted," and instead asks prospective lessors to blindly trust that the lessees' method of calculation, whatever it may be, will comply with the law. Surely this is not what the *Tawney* Court intended when it held that language in an oil and gas lease

24

purporting to allow the lessee to make deductions from the lessor's royalty for post-production costs must "indicate the method of calculating the amount to be deducted."

In this case what is included within reasonable cost? Does it include only the direct cost of providing the service? Or does it include indirect costs, including meals and entertainment, uniforms, meter operations and repair, personal property taxes, personnel costs, production management costs, depreciation, and return on investment which Judge Goodwin found to not be directly related to the cost of getting gas to market? Are costs apportioned by length of the gathering lines, by the dekatherm, or by some other method?

Without the answers to these and other questions, a lease fails to define the method of calculating the amount to be deducted and, therefore, fails the *Tawney* requirements.

This Court strongly believes that the *Tawney* requirements should remain the law in West Virginia for several reasons. First, many of these leases are entered into with unsophisticated individuals who lack the expertise and experience to understand the terms of the lease. Second, with no clear statement as to methodology, the lessee could sell to a related company and thereby control the amount of post-production costs, yet make a large profit downstream. Third, the lessee can include indirect costs that are unrelated to the true post-production costs. It must be emphasized that it is the lessee that controls the information. Most lessors are ill-equipped to conduct an audit of the lessee's numbers, even if they were allowed to do so. This Court believes that *Tawney* should remain the law and require a clearly spelled out mathematical method for deducting post-production costs.

As noted above, the Supreme Court cast a pall on *Tawney* when it criticized it's own holding in *Leggett*. Most recently, the United States Court of Appeals for the Fourth Circuit

25

placed a different spin on *Tawney*, when it relied on *Leggett* (which dealt with a statute) to find that "*Tawney* doesn't demand that an oil and gas lease set out an Einsteinian proof for calculating post-production costs. By its plain language, the case merely requires that an oil and gas lease that expressly allocates some post-production costs to the lessor identify *which costs* and *how much* of those costs will be deducted from the lessor's royalties." *Young v. Equinor USA Onshore Properties, Inc.*, 982 F.3d 201, 208 (4th Cir. 2020).

The Fourth Circuit further held that "*Tawney* doesn't demand that an oil and gas lease set out an Einsteinian proof for calculating post-production costs. By its plain language, the case merely requires that an oil and gas lease that expressly allocates some post-production costs to the lessor identify which costs and how much of those costs will be deducted from the lessor's royalties." *Id*.

Based upon all of the foregoing, this Court prays that the West Virginia Supreme Court of Appeals accepts the certified questions, resolves the conflicts in the law, and continues to protect the citizens of West Virginia.

## Acknowledgement

This Court acknowledges that the Supreme Court of Appeals may reformulate the questions raised herein. W. Va. Code Ann. § 51-1A-4.

## The Names and Addresses of Counsel of Record for the Parties

Counsel for plaintiffs Charles Kellam and Phyllis Kellam:

James G. Bordas III, (WV Bar No. 8518)
Jeremy M. McGraw (WV Bar No. 10325)
BORDAS & BORDAS, PLLC
1358 National Road
Wheeling, WV 26003
jbordasiii@bordaslaw.com
jeremy@bordaslaw.com
304-242-8410 (t)
304-242-3936 (f)

Counsel for defendants, SWN Production Company, LLC and Equinor USA Onshore

Properties, Inc.:

Jennifer Jo Hicks (WVSB ID No. 11423)
Katrina N. Bowers (WVSB ID No. 12337)
Timothy M. Miller (WVSB ID No. 2564)
BABST, CALLAND, CLEMENTS & ZOMNIR, P.C.
BB&T Square
300 Summers Street, Suite 1000
Charleston, WV 25301
681-205-8888
681-205-8814 (fax)
jhicks@babstcalland.com
kbowers@babstcalland.com
tmiller@babstcalland.com

Accordingly, pursuant to the privilege made available by the West Virginia Uniform

Certification of Questions of Law Act, it is hereby **ORDERED** that:

1.      The questions stated above be, and the same hereby are, **CERTIFIED** to the

Supreme Court of Appeals of West Virginia;

2.      The Clerk of this Court forward to the Supreme Court of Appeals of West

Virginia, under the official seal of this Court, a copy of this Order and, to the extent

requested by the Supreme Court of Appeals of West Virginia, the original or a copy of the

record in this Court;

3.    Any request for all or part of the record be fulfilled by the Clerk of this Court simply upon notification from the Clerk of the Supreme Court of Appeals of West Virginia;

4.    Pending action of the West Virginia Supreme Court of Appeals, this matter is **STAYED**; and

5.    The Clerk of this Court is directed to transmit copies of this Order to all counsel of record herein.

It is so **ORDERED**.

**DATED**: September 13, 2021.

**JOHN PRESTON BAILEY**
**UNITED STATES DISTRICT JUDGE**